Shaun Setareh (SBN 204514)
 shaun@setarehlaw.com
H. Scott Leviant (SBN 200834)
 scott@setarehlaw.com
**SETAREH LAW GROUP**
9454 Wilshire Boulevard, Suite 907
Beverly Hills, California 90212
Telephone: (310) 888-7771
Facsimile: (310) 888-0109

Attorneys for Plaintiff EARL FRONDA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARL FRONDA on behalf of himself, all others similarly situated, and the general public,<br><br>*Plaintiff,*<br><br>vs.<br><br>STAFFMARK HOLDINGS, INC., a Delaware Corporation; CEVA LOGISTICS, U.S., INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>*Defendants.* | Case No.: 3:15-cv-02315-MEJ<br><br>**SUPPLEMENTAL DECLARATION OF H. SCOTT LEVIANT IN SUPPORT OF (A) PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS AND (B) PLAINTIFF'S MOTION FOR AN AWARD OF (1) ATTORNEY'S FEES TO CLASS COUNSEL, AND (2) ENHANCEMENT TO PLAINTIFF**<br><br>Date: May 31, 2018<br>Time: 10:00 a.m.<br>Courtroom: Courtroom B – 15th Floor<br>Judge: Hon. Maria Elena James |

SUPPLEMENTAL DECLARATION OF H. SCOTT LEVIANT

I, H. Scott Leviant, declare as follows:

1. I am admitted, in good standing, to practice as an attorney in the State of California, the United States Supreme Court, the Eighth Circuit Court of Appeals, the Ninth Circuit Court of Appeals, and the United States District Courts for the Central, Eastern, Northern and Southern Districts of California. I have never been subject to discipline by the State Bar of California. I am a fully qualified, adult resident of the State of California, and, if called as a witness herein, I would testify truthfully to the matters set forth herein. All of the matters set forth herein are within my personal knowledge, except those matters that are stated to be upon information and belief. As to such matters, I believe them to be true.

2. I am employed as a Senior Associate at the law firm of Setareh Law Group, LLP. My business address is 9454 Wilshire Blvd., Suite 907, Beverly Hills, California 91212 and my business telephone number is (310) 888-7771. I am counsel for Plaintiff.

3. This Supplemental Declaration is submitted in support of (A) Plaintiff's Motion for Final Approval of Class Action Settlement and Certification of Settlement Class and (B) Plaintiff's Motion for an Award of (1) Attorney's Fees to Class Counsel, and (2) Enhancement to Plaintiff. This Supplemental Declaration is responsive to the Court's Order, entered as Docket Item No. 102.[1] Following the answers to the questions specifically posed by the Court, I provide some additional material that I believe to be related to the issues raised or alluded to by the Court's inquiries.

---

[1] As the Order specifies that the response should be a "supplemental declaration," we have prepared the requested document in the format specified by the Court. We acknowledge that, in other contexts, some of the discussion contained herein, and, in particular, the discussion of decisional authority, would not normally be included within a declaration (though that would typically be an issue only if another party objected to the content, which is not likely to occur here). If we have misconstrued the Court's request, or the Court has concerns about the format, we ask that we be permitted to file a supplemental brief in addition to this Declaration.

<u>THE LOCALITY COMPARABLE HOURLY RATES OF CLASS COUNSEL AS IT PERTAINS TO THE REQUESTED FEE AWARD [PARAGRAPH 5 OF DOCKET NO. 102]</u>

4.  In his Motion, Plaintiff utilized Los Angles attorney rates to demonstrated that the rates used for lodestar calculations are reasonable. The Court asks why the relevant community would not be San Francisco, where the Court sits. Other than observing that the matter spans the state, and several facilities at issue are in the greater Los Angeles are, Plaintiff does not have a dispositive basis for contending that San Francisco should not be analyzed in the same manner as Plaintiff analyzed hourly rates for Los Angeles and does so below.

5.  The full 2017-2018 Adjusted Laffey Matrix provides for the following hourly rates for paralegal/law clerks and attorneys falling into various ranges of years of experience:

| Year | Adj. Factor** | Paralegal Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
|---|---|---|---|---|---|---|---|
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |

However, that rate is derived from the Washington, D.C. area and requires a costs of living correction for San Francisco. Using federal statistics for average attorney salaries, attorney pay is 6.6% higher in San Francisco, compared to Washington, D.C., indicating a 6.6% upward adjustment to the Laffey Matrix is appropriate. https://www.bls.gov/oes/current/oes231011.htm.[2] Applying the 6.6% locality adjustment to those rates, the San Francisco rates for the Adjusted Laffey Matrix are as follows:

| Year | Adj. Factor** | Paralegal Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
|---|---|---|---|---|---|---|---|
| 6/01/17- 5/31/18 | 1.0463 | $208.94 | $382.69 | $469.04 | $677.98 | $764.32 | $921.02 |

In addition, using federal employee pay tables, federal employee wages are 8.7% higher in San Francisco, compared to Washington, D.C., indicating an 8.7% upward adjustment to the Laffey Matrix is appropriate. https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2017/general-schedule/.[3] And,

---

[2] Last viewed May 29, 2018.

[3] Last viewed May 29, 2018.

using Schedule 9 of 5 U.S.C. § 5332, there is a 11.03% differential factor applied to San Francisco over Washington, D.C. The locality adjusted chart that uses the 6.6% differential for San Francisco attorney rates is consistent with the hourly billing rates of the other associates that worked on this matter, as discussed below.

<u>THE EXPERIENCE OF ASSOCIATES THOMAS SEGAL, FARAH GRANT, ALICE KIM, STACY SHIM, AND TUVIA KOROBKIN AS IT PERTAINS TO THE REQUESTED FEE AWARD</u>
[PARAGRAPH 1 OF DOCKET NO. 102]

6. Thomas Segal is a 2002 graduate of the University of California Hastings College of the Law. He has practiced almost exclusively class actions and complex litigation since 2005. His time on this matter was billed out at $650 an hour. He has argued before the California Court of Appeal and drafted many appellate briefs, class certification motions, and summary judgment oppositions. He has been part of the trial team including cross-examining witnesses and arguing evidentiary issues in two class action trials, including *Kirk v. First American Title Company*, Los Angeles Superior Court Case No. BC372797 which resulted in a multimillion dollar judgment in favor of the putative class. Courts have approved an hourly rate of $600 an hour for Mr. Segal's services including in 2015 in *Casey v. Orange County's Credit Union*, Orange County Superior Court Case No. 30-2013-000658493 and *Cole v. Asurion Corp. et al.*, Central District of California Case No. CV-06-6649. Mr. Segal's most recently assigned hourly billing rate is $650.00. Mr. Segal billed 27.1 hours for the work he performed in this matter. The tasks performed by Mr. Segal include review of the file upon assuming the role of supervising senior associate when Tuvia Korobkin departed the firm, meetings with Mr. Setareh to determine litigation strategy after the determination was made to remove Amazon from the action, review of discovery responses, review of document production from Defendants, preparation of meet and confer correspondence regarding discovery, meet and confer in-person regarding discovery, case management statement preparation and revision, review and summarization of deposition transcript, review and approval of all correspondence to opposing counsel.

7. Farrah Grant graduated from UCLA Law School in 2013. Since her graduation from law school, Ms. Grant has practiced plaintiff's side employment litigation. Ms. Grant recently went on

maternity leave, but, at the time of her leave, Ms. Grant had over four years of experience litigating wage and hour class actions. Ms. Grant's most recently assigned hourly billing rate is $400.00. In 2017 her assigned billing rate in this matter was $350. Ms. Grant billed 43.8 hours for the work she performed in this matter. The tasks performed by Ms. Grant include legal research for and preparation of first drafts of Oppositions to Motions to Dismiss, preparation of a draft PAGA Notice letter, substantial revisions to what the firm refers to as a "Case Memo" (which provides an analysis of all wage and hour claims, with indexed documentary support where available, updated as discovery elicits new or changed information – some firms refer to these materials as "hot docs" or "trial/certification memos"), and conferences with Mr. Korobkin, Mr. Segal and Mr. Leviant to report on status of case and "Case Memo" revisions.

8.  Alice Kim was admitted to practice law in California in 2013. When Ms. Kim left Setareh Law Group at the end of 2016, she has 3.5 years of experience litigating wage and hour class actions. Ms. Kim's final hourly billing rate assigned by the firm at the end of 2016 was $400.00. Ms. Kim billed 38.4 hours for the work she performed in this matter. Ms. Kim was responsible for preparing initial drafts of the first round of written discovery, conferring with Plaintiff Fronda regarding initial disclosures, and preparing drafts of other case documents for supervising attorneys, including the First Amended Complaint, Second Amended Complaint and the Third Amended Complaint. Ms. Kim also maintained the internal calendar and task list that the firm used to tract activities to be completed and by whom. Ms. Kim participated in numerous meeting with Mr. Setareh and the supervising senior associate to determine case management strategy. Ms. Kim performed an initial review and written analysis of the first round of written discovery responses for use by the supervising senior associate. Ms. Kim also was responsible for providing Mr. Fronda with case updates and explaining documents that the firm sent to him on a regular basis.

9.  Stacey Shim was admitted to practice law in California in 2015. Ms. Shim worked as a law clerk at Setareh Law Group for approximately one year before her admission. She possessed the equivalent of almost four years of experience with wage and hour class action litigation at the time of her resignation in early 2018. Ms. Shim's most recently assigned hourly billing rate was $300.00. In 2017 her assigned billing rate was $250. Ms. Shim billed 24.5 hours for the work she performed in this

matter. Ms. Shim assumed responsibility for all tasks handled by Ms. Kim up until 2016, including task management and calendar supervision. Ms. Shim also assisted Mr. Leviant with the preparation of additional draft declarations based on putative class member interviews, first drafts of pleadings, assembly of materials for discovery meet and confer sessions by Mr. Leviant, initial review and analysis of supplemental responses to discovery provided by Defendants, and review and summary analysis of documents provided by Defendant in discovery and in anticipation of the mediations. Ms. Shim also assisted Mr. Leviant with assembly of materials used in the final drafts of the mediation statements used during the two mediations in this matter.

10. Tuvia Korobkin was admitted to practice law in California in 2009. Mr. Korobkin left the firm in early 2016. Most of Mr. Korobkin's experience was in the litigation of wage and hour class actions, with some experience litigating other consumer class actions. In 2015, his assigned billing rate was $550. Until his departure, Mr. Korobkin was the senior supervising associate assigned to this matter, billing 30.9 hours for reviewing and revising initial pleadings in this matter, reviewing the initial "Case Memo" in conjunction with the preparation of the initial complaint, participation in the post-intake initial interviews of Mr. Fronda, communications with opposing counsel, review and finalization of the First Amended Complaint, the Second Amended Complaint and the Third Amended Complaint in this matter, and performed legal research for and then drafted and revised several Oppositions to Motions to Dismiss. Mr. Korobkin also participated in numerous pre- and post-filing meetings with Mr. Setareh to finalize case management decisions.

## THE ADDITIONAL WORK PERFORMED BY MR. LEVIANT AFTER THE MOTION FOR FINAL APPROVAL WAS FILED [PARAGRAPH 2 OF DOCKET NO. 102]

11. Since the filing of the Final Approval Motion in March, I have spent a total of 13.3 hours working on this matter. That time includes responding to 17 calls from settlement class members asking questions about the settlement approval process (with a particular focus on timing), responding to questions from Plaintiff Fronda on multiple occasions, and review of two new decisions relevant to staffing companies in the wage and hour context as part of a memorandum regarding the status of Defendant CEVA (which research and drafting took a total of 4.9 hours of the 13.3). My travel to the

hearing for Final Approval includes a flight from Burbank to Oakland that morning, and the soonest departing flight that could safely be scheduled after the hearing. The total travel and appearance time is estimated to be 6.5 hours. As a result, my estimate of 25 hours was proven to be high, and, with the travel and appearance time, the correct number is closer to 19.8 hours.

### THE ALLOCATION OF PAGA PENALTIES [PARAGRAPH 3 OF DOCKET NO. 102]

12. Because the settlement is non-reversionary, it was the intent of the settling Parties that the portion of the PAGA penalty payment that distributes to "aggrieved employees," $25,000, would be included in the distribution to class members by way of the Net Settlement Fund. This is provided for in the Settlement implicitly, since the Net Settlement Fund is defined by subtracting payments out of the (gross) Settlement Sum. Since the payment to the LWDA is subtracted, the portion of the PAGA penalty payment that distributes to "aggrieved employees," $25,000, remains a part of the Net Settlement Fund. *See* Settlement, at 1.1(b)(27).

### UNDELIVERABLE NOTICES [PARAGRAPH 4 OF DOCKET NO. 102]

13. As set forth in the concurrently filed Declaration of Zachary Cooley, there were 89 undeliverable notices after remailing of returned notice packets. Updated addresses were not found for 57, and an additional 32 were returned after the best available updated address was used to provide a re-mailed notice.

### DEFENDANT CEVA LOGISTICS [PARAGRAPH 6 OF DOCKET NO. 102]

14. Because counsel for Plaintiff has not located as a substitute plaintiff to proceed against CEVA at this time, Plaintiff's counsel believes that the matter should be resolved individually as to Mr. Fonda with respect to CEVA so as to fully resolve this litigation.

### ADDITIONAL MATERIAL REGARDING FEES – DISCUSSION OF FACTORS APPLICABLE TO BOTH LODESTAR AND PERCENTAGE OF THE FUND METHODS

15. The material that follows is in addition to the questions presented in Docket No. 102, but

we believe that it is relevant to the items identified by the Court as requiring additional information and may be helpful in that regard. In addition to providing a more focused discussion of the factors that can be used to support a lodestar multiplier, the additional material also notes recent Northern District authority that recognizes that common fund fee awards of approximately thirty percent has become a *de facto* standard.

### A. *Stetson v. Grissom*

16. In *Stetson v. Grissom*, 821 F.3d 1157 (9th Cir. 2016), the Ninth Circuit collected Ninth Circuit authority addressing lodestar fee awards (as opposed to percentage of common fund awards) in the context of class action fee requests. After addressing issues regarding hours worked and hourly rates specific to counsel in that matter, the Court then discussed two bases for applying multipliers to base lodestar amounts, known separately as "risk multipliers" and "*Kerr* factors":

> *3. Risk multiplier.* "The district court *must* apply a risk multiplier to the lodestar 'when (1) attorneys take a case with the expectation they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence the case was risky.' Failure to apply a risk multiplier in cases that meet these criteria is an abuse of discretion." *Stanger,* 812 F.3d at 741 (quoting *Fischel,* 307 F.3d at 1008) (emphasis added). Here, there is some evidence of risk—after all, the district court initially dismissed the case before being reversed on appeal—but the record is not developed on the extent of that risk, or on the other two elements. The district court failed entirely to consider whether Class Counsel's representation merited a risk multiplier. On remand, the decision to apply a risk multiplier—or not—remains within the district court's discretion, but in either event it "must fully and adequately explain the basis for its decision." *Stanger,* 812 F.3d at 741.
>
> *4. Kerr factors.* The district court also has discretion to adjust the lodestar upward or downward using a multiplier that reflects "a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 941–42 (9th Cir.2011) (quotation marks omitted). These factors are known as the *Kerr* factors. *See Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *abrogated on other grounds by City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Class Counsel provided a detailed analysis of these factors on pages 16–21 of their motion for attorney's fees; the district court briefly mentioned the factors and then, without any analysis, dismissed them. On remand, the court "must explicitly discuss why the *Kerr* reasonableness factors do or do not favor applying a multiplier (positive or negative) in this case." *See Stanger,* 812 F.3d at 740.

*Stetson v. Grissom*, 821 F.3d 1157, 1166–67 (9th Cir. 2016). While generally focused on separate concerns – the first on pure risk issue and second on a more wholistic evaluation of the result and how it was obtained – there is undoubtedly some overlap in the tests, as the *Kerr* factors are likely impacted by

the presence of some element of risk in a case.

**B.     *Stetson* Risk Factors**

17.     The *Stetson* risk factors – which are a restatement of risk factors recognized in *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997 (9th Cir. 2002) – exist because of the nature of contingent class representation:

> "It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." *Washington Public,* 19 F.3d at 1299; *see also Vizcaino,* 290 F.3d at 1051. This provides the "necessary incentive" for attorneys to bring actions to protect individual rights and to enforce public policies. *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226, 236 (2d Cir.1987). In common fund cases, there is no concern about financially burdening a defendant to compensate for the risk of nonpayment, because the attorney's fee award is deducted from the plaintiffs' fund. *Washington Public,* 19 F.3d at 1300. In such cases, the plaintiffs "should share the wealth with the lawyers whose skill and effort helped create it." *Id.*

*Fischel*, 307 F.3d at 1008 (9th Cir. 2002).

**1.     Setareh Law Group took this "case with the expectation that they [would] receive a risk enhancement if they prevail[ed]."**

18.     When this case was taken on a contingent fee basis, with the firm agreeing to assume responsibility for litigation costs, the ultimate result was far from certain.  In the course of this litigation, Setareh Law Group LLP paid filing fees, copy charges, Westlaw fees, and mailing, telephone and express mail charges.  There was never a guarantee that Setareh Law Group LLP would recoup those expenditures.  Setareh Law Group contributed its experience, time, and resources with no guarantee that it would be compensated for its time.  The firm took on this case, which necessarily required the firm to forego other opportunities, given finite resources to devote to cases.

19.     Because of the uncertainty of the outcome in this and other wage and hour litigation undertaken by Setareh Law Group, we took this case with the expectation that a risk enhancement, either in the form of a lodestar multiplier or a percentage of the fund award equivalent thereto, would be available if we prevailed. This expectation stems from the fact that many cases we undertake as putative class actions do not resolve successfully.  Several examples of cases where long delays, individual arbitration orders, or outright failures precluded a recovery are as follows:

    (a)    *Jefferson v. ABM Janitorial Services-South Central, Inc.*, Case No RG16832708 (Alameda County Superior Court): Motion to compel individual arbitration granted in putative wage and hour class action on March 14, 2017;

    (b)    *Solis v. Ameri-Force Management Services, Inc.*, Case No. 37-2014-00013506-CU-OE-CTL (San Diego Superior Court): Motion for class certification denied and appeal thereof still pending;

    (c)    *Castro v. Cedars-Sinai Health System*, Case No. BC675795 (Los Angeles Superior Court): Putative class action Ordered to individual arbitration;

    (d)    *Ahlstrom v. DHI Mortgage Company GP, Inc.*, Case No. 5:17-cv-04383-BLF (Northern District): Putative wage and hour class action stayed pending outcome of *Morris v. Ernst & Young LLP*, 834 F.3d 975 (9th Cir. 2016) (subsequently reversed by U.S. Supreme Court).

    (e)    *Troester v. Starbucks Corporation*, Case No. 2:12-CV-07677-GAF-PJW (Central District): Filed in **2012**, the District Court granted summary judgment for defendant, plaintiff appealed, and the Ninth Circuit certified a question of law to the California Supreme Court, which accepted the question and has the matter under submission nearly six years later;

    (f)    *Rodriquez v. Taco Bell Corp.*, Case No. 1:13-CV-01498-SAB (Eastern District): Filed in **2013**, the District Court granted summary judgment, which plaintiff appealed. The matter remains under submission after argument;

    (g)    *Nichols v.* Northrop Grumman Systems Corporation, Case No. 17CV317207 (Santa Clara Superior Court): Defendants' request to compel individual arbitration stayed pending outcome of *Morris v. Ernst & Young LLP*, 834 F.3d 975 (9th Cir. 2016);

    (h)    *Perry v. John Stewart Company*, Case No. CGC-17-558785 (San Francisco Superior Court): Ordered to individual arbitration;

    (i)    *Gilberg v. California Check Cashing Stores, Inc.*, Case No. 2:15-CV-02309-JAM-AC (Eastern District): After motion for summary judgment by defendants granted

in putative class action, matter remains pending in Ninth Circuit after appeal by plaintiff; and,

(j)  *Watterson v. Garfield Beach CVS LLC*, Case No. 14–cv–01721–HSG (Northern District): Summary judgment granted in putative wage and hour class action, and subsequently affirmed on appeal to the Ninth Circuit.

20. Because a significant percentage of putative class action cases filed by Setareh Law Group are not successful on a classwide basis due to arbitration agreement enforcement, certification denial, dismissal motions, or summary judgment, this firm expects that those matters, which can exist for years, through appeals, with no compensation for case costs, firm operating costs, or attorney time, we do perceive the wage and hour class action field to be a risk-filled practice area. The law is constantly evolving in this field. Case viability swings unpredictably on a pendulum as courts of appeal limit or expand the previously understood scope of various Labor Code claims. The percentage of cases successfully certified either through contested motions *or* settlements is low in both state and federal court. According to statistics published by the California Courts, just over 21% of class actions were certified either as part of a settlement *or* as part of a contested certification motion during the study years. *See*, H. Scott Leviant, *Second Interim Report on class actions in California sheds new light on certification* (February 19, 2010), www.thecomplexlitigator.com, available at http://www.thecomplexlitigator.com/post-data/2010/2/19/second-interim-report-on-class-actions-in-california-sheds-n.html; *see also*, *Findings of the Study of California Class Action Litigation*, 2000-2006, available at http://www.courtinfo.ca.gov/reference/documents/class-action-lit-study.pdf (finding, at page 5, and in Table 9, at page 15, that only 21.4% of all class actions were certified either as part of a settlement *or* as part of a contested certification motion). In our experience, the results in federal court are fairly close to this figure from California state courts.

21. Therefore, Setareh Law Group does expect upon the filing of a putative wage and hour class action that a risk enhancement is expected (within reasonable limits) when a case is filed.[4]

---

[4] Setareh Law Group does *not* expect that a risk enhancement on its lodestar would be used to exhaust a common fund when the result is "upside down," meaning that the lodestar required to obtain the result approaches the value of the common fund itself.

### 2. The hourly rates of Setareh Law Group attorney are set in line with market hourly rates for hourly work, using the Adjusted Laffey Matrix, and those rates do not reflect the risk of nonpayment.

22. As set forth more fully above and in the previously filed Declarations we believe that the requested hourly rates are in line with market rates in San Francisco and Los Angeles.

23. The firm's rates do *not* incorporate extra-market rates to build in a risk of nonpayment. Rather, the rates are in line with metropolitan practice areas in Southern and Northern California.

### 3. There is "evidence that the case was risky."

24. While this factor was partially discussed, at least implicitly, in Plaintiff's Motion, it bears repeating that the outcome was far from certain here due to some substantial risk factors. There are always significant risks associated with certification and trials, and those risks, which cannot be eliminated in this case, are undeniable. Specific risks associated with this matter include:

- the significant risk that some claims would be deemed legally *de minimis* under California law (the existence of said defense being an issue that is currently pending before the California Supreme Court);
- the significant risk posed by recent developments in California wage and hour law regarding staffing company liability for wage and hour violations caused entirely by the client of the staffing company;
- the risk that Plaintiff would be unable to establish liability for allegedly unpaid straight time or overtime wages, *see, e.g. Dilts v. Penske Logistics, LLC* 2014 WL 205039 (S.D. Cal. 2014) (dismissing certified off-the-clock claims based on proof at trial);
- the risk that Defendant's challenged employment policies might not ultimately support class certification or a class-wide liability finding, *see, e.g. In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (holding that deficient policies, alone, cannot support certification if evidence shows highly individualized practices may exist);

- the risk that uncertainties pertaining to the ultimate legality of Defendants' policies and practices could preclude class-wide awards of statutory penalties under Labor Code §§ 203 and 226(e);
- the risk that individual differences between Settlement Class Members could be construed as pertaining to liability, and not solely to damages, *see*, *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d at 958-59;
- the risk that any civil penalties award under the PAGA could be reduced by the Court in its discretion, see Labor Code § 2699(e)(1);
- the risk that class treatment could be deemed improper as to one or more claims except for settlement purposes; and,
- the risk that lengthy appellate litigation could ensue.

These risks are non-exhaustive. Moreover, in our opinion, ***significant*** weight must be given to the risk posed by recent changes in the California law and the unsettled risk surrounding how *de minimis* time is defined under California law. This Settlement provides a benefit to the Class Members that is very reasonable in light of these particular risks, and the small risk multiplier requested is consistent with the very substantial risks presented here.

### C. *Kerr* Factors

25.     Separate from the *Stetson* factors, this Court is also authorized to adjust lodestar based on the *Kerr* factors. As the Ninth Circuit summarized in another case:

> Though the lodestar figure is "presumptively reasonable," *Cunningham v. Cnty. of Los Angeles,* 879 F.2d 481, 488 (9th Cir.1988), the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of "reasonableness" factors, "including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment," *Hanlon,* 150 F.3d at 1029 (citing *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975)[7]). Foremost among these considerations, however, is the benefit obtained for the class. *See Hensley v. Eckerhart,* 461 U.S. 424, 434–36, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *McCown v. City of Fontana,* 565 F.3d 1097, 1102 (9th Cir.2009) (ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff").

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941–42 (9th Cir. 2011). In this regard, the *Kerr* factor analysis intersects with the "evidence of risk" factor in the *Stetson* analysis. The result here should

be judged against the risk of non-recovery. In our opinion, the risk of non-recovery was not insignificant. The likelihood that Plaintiff could have certified even some of the claims in this matter if faced with a contested motion was unclear. That we obtained a sizeable classwide settlement is, by that measure, fairly impressive, given the real risk of no recovery. Thus, the "benefit obtained" and the "risk of nonpayment" *Kerr* factors, as applied here, support a multiplier, and the benefit factor is the primary factor considered under this evaluation. The complexity and novelty factor leans mildly in favor of Plaintiff's position as wage and hour issues in the context of staffing agencies are somewhat unsettled as far as class action treatment is concerned. The result, the most important element, implies that the representation was above average.

### D. The Small Multiplier Is Within the Range of Common Lodestar Multipliers

Comparing a percentage fee award to the lodestar "provides a check on the reasonableness of the percentage award." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002). Percentage awards in the range of one to four times the lodestar are common. *Id.* at 1051 n.6 (finding a range of 0.6 to 19.6 in a survey of 24 cases, with 83% in the range of 1.0 to 4.0 and 54% in the 1.5 to 3.0 range, and citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." (quoting 3 Newberg § 14.03 at 14-15))).

### E. Separately, This District Has Recognized That 30% of Common Funds Is a Frequently Awarded Fee

26. Separate from the lodestar approach, Courts in this District have recognized that fee awards in class action frequently exceed the benchmark of 25% in the Ninth Circuit:

> The percentage of the Settlement Fund that Lead Counsel seeks is slightly in excess of the benchmark of 25% established by the Ninth Circuit. *See, e.g., Powers v. Eichen,* 229 F.3d 1249, 1256 (9th Cir.2000). However, in most common fund cases, the award exceeds that benchmark. *Activision,* 723 F.Supp. at 1377–78 (surveying securities cases nationwide and noting, "This court's review of recent reported cases discloses that nearly all common fund awards range around 30% ...."); *see also Ikon Office Solutions,* 194 F.R.D. at 194 ("The median in class actions is approximately twenty-five percent, but awards of thirty percent are not uncommon in securities class actions."). The *Activision* court concluded that, where a court adopts the percentage method, "absent

extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%." 723 F.Supp. at 1378. Plaintiffs provide substantial authority reflecting the same trend. Mot. for Fees at 12–13.

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047–48 (N.D. Cal. 2008). Thus, as an alternative approach to the lodestar, a thirty percent fee award would be entirely consistent with a percentage-based award in a common fund case that includes the risk factors discussed above, and thirty-three percent is supportable in light of the quality of the result and the unsettled legal questions surrounding this matter.

I declare under penalty of perjury, under the laws of the State of California and the United States, that the foregoing is true and correct.

Executed this 29th day of May 2018, at Beverly Hills, California.

_____
H. Scott Leviant, "Declarant"