UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EARL FRONDA,

          Plaintiff,

    v.

STAFFMARK HOLDINGS, INC., et al.,

          Defendants.

Case No. 15-cv-02315-MEJ

**ORDER RE: (1) MOTION FOR FINAL APPROVAL AND CERTIFICATION OF SETTLEMENT CLASS AND (2) MOTION FOR ATTORNEYS' FEES AND ENHANCEMENT AWARD**

Re: Dkt. No. 98

### INTRODUCTION

On November 27, 2017, the Court preliminarily approved the class action settlement proposed by Plaintiff Earl Fronda and Defendants Staffmark Holdings, Inc. and CBS Personnel Services, LLC (together, the "CBS Defendants"). Prelim. Approval Order, Dkt. No. 92; *see* Settlement, Dkt. No. 86-1 & Leviant Decl., Ex. 1, Dkt. No. 97. Plaintiff now seeks final approval of the Settlement, as well as attorneys' fees and costs. Final Approval Mot., Dkt. No. 98; Fees Mot., Dkt. No. 99. Neither CBS Defendants nor Defendant CEVA Logistics U.S., Inc. oppose the Motion for Final Approval. Dkt. Nos. 100-01.

The Court held a hearing on these matters on May 31, 2018. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS** the Motion for Final Approval and **GRANTS IN PART** the Motion for Attorneys' Fees and Enhancement Award.

### BACKGROUND

Plaintiff was jointly employed by Staffmark, CBS Personnel, and CEVA. Third Am. Compl. ("TAC") ¶ 3, Dkt. No. 57; *see id.* ¶ 13. On April 17, 2015, Plaintiff initiated this action in Alameda County Superior Court, naming as Defendants Staffmark, CEVA, and Amazon.com

LLC.  *See* Not. of Removal, Ex. A (Compl.), Dkt. No. 1; *see also id.*, Ex. B (First Am. Compl.).

CEVA removed the action to this Court on May 22, 2015.  *See* Notice of Removal.  Amazon.com

was dismissed on June 12, 2015.  Dkt. No. 28.  Plaintiff filed his Second Amended Complaint on

July 13, 2015.  Second Am. Compl., Dkt. No. 34.  On October 9, 2015, CBS Personnel was added

as a Defendant.  Dkt. No. 52.

Plaintiff filed the operative TAC on December 27, 2015.  *See* TAC.  Plaintiff asserts eight

claims based on California state law: (1) Failure to Provide Meal Periods, (2) Failure to Provide

Rest Periods, (3) Failure to Pay Hourly Wages, (4) Failure to Provide Accurate Written Wage

Statements, (5) Failure to Timely Pay All Final Wages, (6) Failure to Pay Wages without

Discount, (7) Unfair Competition, and (8) Civil Penalties under the Private Attorneys General Act

("PAGA").  *Id.* ¶¶ 23-124.  The Court has jurisdiction over the matter pursuant to the Class Action

Fairness Act of 2005, 28 U.S.C. § 1332(d).  *Id.* ¶ 2.

Plaintiff and the CBS Defendants settled their claims in private mediation on January 4,

2017 and April 26, 2017.  Leviant Decl. ¶ 8, Dkt. No. 97.  But the proposed Settlement

> does not resolve the matter as to Defendant CEVA LOGISTICS, U.S., INC., though it does resolve claims by the settlement Class against any joint employers of the CBS Defendants, including CEVA Freight, LLC and CEVA Logistics U.S., Inc., to the extent that any of the claims settled as to the CBS Defendants would apply to any CEVA defendant.

Final Approval Mot. at 2.[1]

---

[1] At the preliminary approval hearing, counsel for Plaintiff indicated he may seek to substitute another plaintiff to pursue claims against CEVA.  Nov. 16, 2017 Oral Argument at 10:06-10:12; Prelim. Approval Order at 2 n.1.  Counsel has not located a substitute plaintiff, but believes the Settlement "should be resolved individually as to Mr. Fronda with respect to CEVA so as to fully resolve this litigation."  Suppl. Leviant Decl. ¶ 14, Dkt. No. 104; May 31, 2018 Oral Argument at 10:26-10:27.  At the final approval hearing, counsel represented Plaintiff would seek to dismiss CEVA upon the Court granting final approval of the Settlement.  May 31, 2018 Oral Argument at 10:27.

United States District Court
Northern District of California

**SETTLEMENT TERMS**

The Court summarizes the key terms of the Settlement below.

**A.       Settlement Class and Class Period**

The Settlement Class is defined as "any and all individuals employed by the CBS Defendants at CEVA Freight, LLC, CEVA Logistics U.S., Inc. and/or any other location of CEVA, CEVA's parents or any CEVA-related entity operating in California during the Class Period."  Settlement § 1.1(b)(4).  The Class Period is defined as April 17, 2011 through the date the Court preliminarily approved the Settlement.  *Id.* § 1.1(b)(12).  The Class is composed of 4,407 individuals.  Cooley Decl. ¶ 2, Dkt. No. 96 & Leviant Decl., Ex. 2.

**B.       Distribution of Settlement Payments**

The Settling Defendants agree to pay a maximum Settlement Sum of $5,600,000.  Settlement §§ 1.1(b)(25), 3.6(a).  This figure includes (1) payments to Class Members, (2) Class Counsel's attorneys' fees and costs, (3) administration costs, (4) any enhancement award to Plaintiff, and (5) payment to the California Labor and Workforce Development Agency ("LWDA").  *Id.* § 1.1(b)(25).

The Net Settlement Sum represents the Settlement Sum less attorneys' fees and costs, administration costs, an enhancement award, and the LWDA payment.  *Id.* §§ 1.1(b)(27), 3.6(b)(1)(A)-(E).  Participating Class Members shall be paid a proportionate share of the Net Settlement Sum.  *Id.* § 3.6(b)(2)(A).  The Settlement Administrator shall calculate the Individual Class Member Settlement Amount – the amount of the Net Settlement Sum allocated to each participating Class Member – in the following manner: the Net Settlement Sum shall be divided by the total number of weeks worked for the CBS Defendants by all participating Class Members at any CEVA location in California.  *Id.* §§ 1.1(b)(29), 3.6(b)(2)(B).  This number will be multiplied by the number of weeks worked by each Class Member.  *Id.*  The Settlement Administrator shall determine the number of weeks worked by each Class Member by (1) first multiplying the number of weeks worked at the Carson Location and the Torrance Location by two, then (2) adding this number to the number of weeks worked by the Class Member during the

United States District Court
Northern District of California

United States District Court
Northern District of California

Class Period at all CEVA locations in California other than the Carson and Torrance Locations.[2] *Id.* § 3.6(b)(2)(B).

Class Members may dispute the Settlement Administrator's determination of the number of weeks he or she worked for the CBS Defendants by sending a letter to the Settlement Administrator within 30 days of the initial mailing of class notice. *Id.* § 3.4(c). The Class Member must state the number of weeks he or she believes are correct and include supporting documentation. *Id.* The Settlement Administrator shall review the relevant records and documentation and make a recommendation to the Court on all disputed claims. *Id.* The Settlement Administrator shall also send written notice of its decision on the disputed claim to the Class Member, Class Counsel, and the CBS Defendants' counsel no later than 10 days before the final fairness hearing. *Id.* The Court shall decide any disputed claims at that hearing, and the Court's decision will be final. *Id.*

No later than 45 days following the Effective Date of the Settlement, the Settlement Administrator will issue checks made payable to each participating Class Member for each Class Member's Individual Class Member Settlement Amount. *Id.* §§ 3.6(c)(2)(E), (c)(3). Class Members will receive two checks. *Id.* § 3.6(c)(2)(E)(i). The first check will be for two-thirds of the Individual Class Member Settlement Amount and will represent payment of penalties and interest. *Id.* § 3.6(c)(2)(E)(i)(I). The second check will be for the remaining one-third of the Individual Class Member Settlement Amount, representing payment for the alleged unpaid wages. *Id.* § 3.6(c)(2)(E)(i)(II).[3]

If checks remain uncashed after 90 days, the Settlement Administrator shall send a reminder postcard to those Class Members with unpaid checks, advising them to cash the check or to request a replacement. *Id.* § 3.6(c)(4). A similar postcard will be sent to Class Members who

---

[2] The Carson Location refers to the CEVA location on Bishop Avenue in Carson, California; the Torrance Location refers to the CEVA location on Western Avenue in Torrance, California. Settlement §§ 1.1(b)(15)-(16).

[3] At the preliminary approval hearing, Plaintiff's Counsel explained that issuing two checks better enables the Settlement Administrator to process the payroll deductions and make the accounting clear to Class Members.

1  have not cashed their checks after 150 days.  *Id.*  Uncashed checks will be voided after 180 days.

2  *Id.*  Funds from uncashed checks will be redistributed as follows: 25% will be paid to the

3  California State Equal Access Fund, 25% will be paid to the California State Treasury for deposit

4  in the Trial Court Improvement and Modernization Fund, and 50% will be paid to Legal Aid at

5  Work as a cy pres recipient.  *Id.*

6  **C.    Objections and Opt Outs**

7      Class Members may request exclusion from or object to the Settlement.  *Id.* §§ 3.4(a)-(b).

8  To be excluded from the Settlement, Class Members must send a request for exclusion to the

9  Settlement Administrator within 30 days of the initial mailing of the Class Notice.  *Id.* § 3.4(a)(1).

10  The request must include the Class Member's name, address, and statement electing to be

11  excluded from the Settlement.  *Id.* § 1.1(b)(21).

12      Class Members may object to the Settlement by sending a written notice of objection that

13  states the basis therefor.  *Id.* § 3.6(b)(2).  Class Members must send any objections to the Court

14  and the parties within 30 days of the date of the initial mailing of the Class Notice.  *Id.*

15      In addition, the Settlement gives the CBS Defendants the right to rescind the Settlement in

16  the event that more than 10% of Class Members request exclusion from the Settlement.  *Id.* § 6.3.

17  **D.    Attorneys' Fees and Costs**

18      The Settlement provides for all Class Counsel's attorneys' fees and costs to be paid from

19  the Settlement Sum.  *Id.* § 3.6(e).  Class Counsel will seek up to one-third of the Settlement Fund,

20  that is, $1,866,666.67.  *Id.*; *see also* Nov. 16, 2017 Oral Argument at 9:56-57 ("The intention of all

21  the parties is that Plaintiff's counsel would ask than no more than one-third of the total settlement

22  in fees and costs.  There is no intention and there will be no request for more than one-third.").

23  The CBS Defendants agree not to object to this request.  Settlement § 3.6(e).

24  **E.    Enhancement Award**

25      Plaintiff shall seek an enhancement award of no more than $10,000.  Settlement § 3.6(f).

26  This award shall be deducted from the Settlement Sum.  *Id.*

27  **F.    LWDA Payment**

28      The Settlement provides for $100,000 as payment for the PAGA claims.  *Id.* § 3.6(g).

5

Pursuant to California Labor Code section 2699(i), $75,000 shall be paid to the LWDA. *Id.* The remaining $25,000 shall be distributed to Class Members. Suppl. Leviant Decl. ¶ 12.

**G.    Settlement Administrator and Administration Costs**

The Settlement Administrator shall (1) mail class notices to Class Members; (2) calculate the amounts due to each Class Member; (3) notify the parties and make recommendations to the Court regarding any disputes brought by Class Members; (4) make all payments required by the Settlement; and (5) issue all tax-related documents associated with payments under the Settlement. Settlement § 1.1(b)(17). The parties agree KCC, LLC shall be the Settlement Administrator. *Id.*

The Settlement allocates up to $25,000 in administration costs, to be paid from the Settlement Sum; however, "the Parties agree to work together to reduce this amount." *Id.* § 3.6(d). Administration costs include all costs incurred by the Settlement Administrator in administering the Settlement, such as: address verification measures; mailing of class notice; calculation, preparation, and issuance of Individual Settlement Payments; administration of any uncashed checks; and preparation and issuance of checks for other payments. *Id.* § 1.1(b)(20). In the event administration costs exceed $25,000, the amount in excess shall also be paid from the Settlement Sum, subject to Court approval. *Id.* § 3.6(d).

**H.    Released Claims and Parties**

In exchange for benefits under the Settlement, Class Members release

> any and all claims, rights, demands, liabilities, and causes of action of every nature and description, known or unknown, in law or in equity, as alleged in the Complaint and any Amended Complaint in this Litigation or at the mediations conducted in this matter on January 4, 2017 and April 26, 2017, arising from or related to the following claims against any and all of the CBS Defendants: (1) Failure to Provide Meal Periods; (2) Failure to Provide Rest Breaks; (3) Failure to Pay Hourly Wages; (4) Failure to Provide Accurate Itemized Wage Statements; (5) Failure to Pay Waiting Time Penalties and Wages; (6) Failure to Pay Wages Without Discount; (7) Unfair Business Practices that relate to any of those claims; and (8) Civil Penalties under the Private Attorney[s] General[] Act ("PAGA").

*Id.* § 1.1(b)(32); *see id.*, Art. V. Class Members further release

> any other claims, whether known or known, suspected or unsuspected, that were or could have alleged or asserted based upon the legal and factual allegations in this matter and related to a Class

6

> Member's employment as a temporary employee of CBS Defendants at a CEVA location during the Class Period, including all claims that were or could have been brought under the California Labor Code, the applicable Industrial Wage Commission Wage Orders, the Fair Labor Standards Act, Business and Professions Code section 17200 as it relates to the underlying Labor Code claims . . . and the Private Attorneys General Act as it relates to the underlying Labor Code violations . . . , including any damages, restitution, interest waiting time penalties, penalties, punitive damages, attorneys' fees, costs, or any other form of relief whatsoever, during the Class Period.

*Id.* § 1.1(b)(32). Class Member Released Claims "also include any claims against CEVA Logistics U.S. Inc., CEVA Freight LLC and/or any other CEVA entity to the extent that any of the released claims as to CBS Defendants would apply to" those CEVA entities. *Id.*

Released parties are defined as

> CBS Defendants, their past and present divisions, affiliated entities, related entities, parents, subsidiaries, predecessors, successors, joint ventures, assigns, and their respective shareholders, owners, officers, directors, employees, agents, trustees, attorneys, managers, operators, insurers, representatives, administrators, fiduciaries, beneficiaries, subrogees, executors, partners, privies, representatives, consultants, and attorneys.

*Id.* § 1.1(b)(31). In addition, "[t]o the extent Class Member Released Claims also include any claims against CEVA Logistics U.S. Inc., CEVA Freight LLC and/or any other CEVA entity," those entities shall also be Released Parties. *Id.*

The back of each check issued to Class Members shall state

> My signature hereon constitutes a full and complete release by me of Staffmark Holdings, Inc. and CBS Personnel Services LLC and all "Released Parties" as described in the Stipulation and Agreement to Settle Class Action and Limited Release for all claims alleged in or arising out of the Litigation known as *Fronda v. Staffmark Holdings, Inc. et al.*, Case No. 3:15-cv-02315-MEJ, including, but not limited to, all "Class Member Released Claims" as described more fully in the Stipulation and Notice to the Class.

*Id.* § 3.6(c)(E)(ii).

## I. Future Disputes

Disputes regarding the implementation or interpretation of the Settlement shall be submitted to the private mediator the parties previously worked with to settle their dispute. *Id.* § 6.12. Any disputes concerning the Settlement Administrator's ability and need to perform its

7

duties shall be first referred to the mediator, then to the Court, if necessary.  *Id.*  The Court shall

retain jurisdiction over the terms and conditions of the Settlement.

**MOTION FOR FINAL APPROVAL & CLASS CERTIFICATION**

**A.      Legal Standard**

The Ninth Circuit maintains "a strong judicial policy that favors settlements, particularly

where complex class action litigation is concerned."  *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th

Cir. 2015) (internal quotation marks omitted).  "[S]ettlement class actions present unique due

process concerns for absent class members[.]"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026

(9th Cir. 1998); *see Allen*, 787 F.3d at 1223 ("[T]he district court has a fiduciary duty to look after

the interests of those absent class members.").  There is, for instance, "the risk that class counsel

may collude with the defendants."  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944

(9th Cir. 2015) (internal quotation marks omitted).

To guard against such risks, Federal Rule of Civil Procedure 23(e) requires courts to

determine whether a proposed settlement "is fundamentally fair, adequate, and reasonable."

*Hanlon*, 150 F.3d at 1026; Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members,

the court may approve it only after a hearing and on finding that it is fair, reasonable, and

adequate.").  The Ninth Circuit has identified eight factors courts should consider in evaluating the

fairness of a class action settlement:

> (1) the strength of the plaintiffs' case; (2) the risk, expense,
> complexity, and likely duration of further litigation; (3) the risk of
> maintaining class action status throughout the trial; (4) the amount
> offered in settlement; (5) the extent of discovery completed and the
> stage of the proceedings; (6) the experience and views of counsel;
> (7) the presence of a governmental participant; and (8) the reaction
> of the class members of the proposed settlement.

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted).

Where a settlement agreement is negotiated prior to formal class certification, it is subject to a

higher level of scrutiny, and a court's approval order must ensure that the settlement is not the

product of collusion among the negotiating parties.  *Id.* at 946-47.  "It is the settlement taken as a

whole, rather than the individual component parts, that must be examined for overall fairness."

*Hanlon*, 150 F.3d at 1026.  Courts cannot "delete, modify or substitute certain provisions"; rather,

8

"[t]he settlement must stand or fall in its entirety." *Id.* (internal quotation marks omitted).

**B.     Class Certification**

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the Class satisfies the requirements of Rule 23(a) and (b). *See Hanlon*, 150 F.3d at 1019, 1022.

No new facts affect the Court's decision since the Court preliminarily certified the Class. Prelim. Approval Order at 9-13. This Order incorporates by reference the Court's prior analysis under Rules 23(a) and (b)(3) as set forth in the Preliminary Approval Order. The Court affirms its previous findings and certifies the Class under Rule 23(b)(3).

**C.     Adequacy of Notice**

Before assessing the fairness of the Settlement, the Court considers whether Class Members received adequate notice of it. *See* Fed. R. Civ. P. 23(c)(2)(B) ("For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) (internal quotation marks omitted).

On December 22, 2017, Settlement Administrator KCC received the Class List containing the names, addresses, social security numbers, and weeks worked of 4,407 Class Members. Cooley Decl. ¶ 2. After processing the names and addresses through the National Change of Address Database, KCC updated 558 addresses. *Id.* On January 26, 2018, KCC mailed a notice packet containing the Court-Authorized Notice and Data Summary Sheet to 4,402 Class Members. *Id.* ¶ 3; *see id.*, Ex. A (notice packet); May 31, 2018 Oral Argument. There were 238 notice packets returned as undeliverable. Cooley Decl. ¶ 4; Suppl. Cooley Decl. ¶ 2, Dkt. No. 103. KCC's address search for these packets resulted in updated addresses for 181 Class Members, and

1    KCC re-mailed notice packets for these individuals.  Cooley Decl. ¶ 4.  As of May 29, 2018, KCC

2    received 32 notice packets returned for a second time.  Suppl. Cooley Decl. ¶ 2.  Thus, a total of

3    89 Class Members did not receive individual notice through the initial mailing and the subsequent

4    re-mailing after address updating.

5        In addition to providing individual notice, KCC established a website to provide

6    information to Class Members.[4]  *Id.* ¶ 5.  The notice packet provided the website URL, and the

7    website allowed visitors to download copies of the Notice and other case-related documents.  *Id.*

8    KCC also established a toll-free telephone number to answer Class Members' inquiries.  *Id.* ¶ 6.

9        The deadline to request exclusion or to submit an objection was February 26, 2018.  No

10   Class Member sought exclusion from or objected to the Settlement.  *Id.* ¶¶ 7-8.

11       Under the circumstances, the Court is satisfied this method of providing notice was

12   reasonably calculated and the best practicable means to notify Class Members of the Settlement.

13   Although 89 Class Members did not receive notice, this figure represents approximately 2% of the

14   Class; the vast majority of Class Members were individually notified of the Settlement.  Rule 23

15   does not require actual notice of settlement to class members in time to opt out of the class.

16   Rather, notice need only be "reasonably certain to inform the absent members of the plaintiff

17   class[.]"  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (internal quotation marks omitted);

18   *see Mullane*, 339 U.S. at 319 ("[N]otice reasonably certain to reach most of those interested in

19   objecting is likely to safeguard the interests of all, since any objections sustained would inure to

20   the benefit of all.  We think that under such circumstances reasonable risks that notice might not

21   actually reach every beneficiary are justifiable.").

22   **D.    Fairness, Adequacy, and Reasonableness**

23       In preliminarily approving the Settlement, the Court found it was "fair, reasonable, and

24   adequate" under Rule 23(e)(2).  The preliminary approval stage is "an 'initial evaluation' of the

25   fairness of the proposed settlement made by the court on the basis of written submissions and

26   informal presentation from the settling parties."  *In re High-Tech Emp. Antitrust Litig.*, 2013 WL

27

28   _____
     [4] www.StaffmarkHoldingsSettlement.com

                                          10

6328811, at *1 (N.D. Cal. Oct. 30, 2013) (citation omitted).  The Court now considers each of the *In re Bluetooth* factors to determine whether the Settlement is fair, adequate, and reasonable.

> 1. <u>The Strength of Plaintiff's Case; the Risk, Expense, Complexity, and Likely Duration of Further Litigation; and the Risk of Maintaining Class Action Status throughout Trial</u>

Settlement will avoid "additional expensive and time-consuming litigation" that could delay benefits for Class Members and could result in a less favorable outcome.  Leviant Decl. ¶ 13.  Indeed, Mr. Leviant represents the CBS Defendants would "aggressively challenge Plaintiff's case at the certification stage." *Id.* ¶ 15.  Although Plaintiff believes his case would survive throughout trial, he recognizes there are risks associated with continued litigation.  *Id.*; *see id.* ¶ 16 (recognizing "the strong case that CBS Defendants could bring to bear to challenge certification and liability").  Such risks include (1) an inability to establish liability for allegedly unpaid straight time or overtime wages; (2) an inability to obtain class certification or class-wide liability based on the CBS Defendants' challenged employment policies; (3) an inability to obtain class-wide awards of statutory penalties under Labor Code section 203 and 226(e); (4) individual differences between Class Members be construed as pertaining to liability, not damages; (5) a Court-reduction of civil penalties under PAGA; (6) a finding that class treatment is improper as to one or more claims except for settlement purposes; (7) a lengthy appeal; and (8) a "significant" risk that some of Plaintiff's claims would be deemed legally de minimis under California law, an issue pending before the California Supreme Court. *Id.* ¶ 15.  Plaintiff has "carefully considered the[se] risks" in evaluating the reasonableness of the Settlement. *Id.*  Although Plaintiff is confident that he has "credible strategies for responding to the[se] legal and factual risks," Mr. Leviant represents the Settlement provides a benefit to Class Members that is reasonable in light of these risks. *Id.*; *see id.* ¶ 19.

The Court finds these factors favor final approval.

> 2. <u>The Amount Offered in Settlement</u>

"To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiffs' expected recovery balanced against the

11

value of the settlement offer." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *9 (N.D. Cal. Apr. 29, 2011) (internal quotation marks omitted).

KCC estimates that the maximum payment will be $16,203.28 and the average payment will be $822.23. Cooley Decl. ¶ 9; *see* Leviant Decl. ¶ 16 ("[T]he average gross recovery before deductions for taxes, fees, and other costs, is approximately $1,270 per class member."). These figures are based on the assumption that the Settlement Fund amount is $5.6 million, with the following deductions: (1) a Class Counsel Award of $1,866,666.67; (2) a $10,000 enhancement award to Plaintiff; (3) a $75,000 PAGA payment to the LWDA; and (4) settlement administration costs of $24,750. Cooley Decl. ¶ 9. This leaves $3,623,583.33 as the Net Distribution Fund to be disbursed to Class Members. *Id.*

Mr. Leviant declares "this outcome is in line with a carefully constructed estimate of the current fair value of the case." Leviant Decl. ¶ 17. He explains that

> the estimated exposure for off the clock work spent in security check stations over the class period was calculated to be approximately $1,200,000. With risk factor discounts for certification and liability proof, the value of that claim is estimated by Plaintiff's counsel to be approximately $400,000. And, the estimated exposure for meal period violations over the class period was calculated to be approximately $3,200,000. With risk factor discounts for certification and liability proof, the value of that claim is estimated by Plaintiff's counsel to be approximately $1,000,000. A similar valuation applies to the rest period claim. Performing similar risk-adjusted valuations for all claims yields a total value in the range of $5,000,000 – $7,000,000.

*Id.* ¶ 18.

The amount offered in the Settlement supports final approval.

3.   The Extent of Discovery Completed; the Stage of the Proceedings; and the Experience and Views of Counsel

Courts often "look to the amount of exchanged information prior to settlement to determine whether the parties have made an informed decision to settle the case." *Willner v. Manpower Inc.*, 2015 WL 3863625, at *4 (N.D. Cal. June 22, 2015) (citation omitted).

"Plaintiff's counsel brought to bear a great deal of experience with class actions in negotiating the settlement of this case." Leviant Decl. ¶ 12; *see id.* ¶ 37 ("Class Counsel's

experience in wage and hour class actions was integral in evaluating the strengths and weaknesses of the case against Defendant and the reasonableness of the settlement.").  Plaintiff and his counsel "diligently investigated" the claims and conducted "the necessary investigation into this case" to engaged in informed settlement negotiations.  *Id.* ¶ 14.  The parties negotiated the settlement only after commencing discovery, which included interrogatories and requests for production to all Defendants.  *Id.*  Defendants produced thousands of pages of documents in response to formal discovery, data about class composition, and video footage.  *Id.*  This allowed Plaintiff and his counsel to adequately evaluate the Settlement.  *Id.*

    4.    <u>The Presence of a Governmental Participant</u>

No government entity participated in this action; this factor is neutral.

    5.    <u>The Reaction of Class Members of the Proposed Settlement</u>

As noted, there were no requests for exclusion or objections.  Cooley Decl. ¶¶ 7-8.  No Class Members appeared at the May 31 hearing.  This weighs strongly in favor of final approval.

    6.    <u>Summary</u>

Based on the foregoing, the *Bluetooth* factors favor final approval.

**E.    Potential Collusion**

Where a settlement is reached prior to class certification, courts must also consider whether the settlement is the product of collusion among the negotiating parties.  *In re Bluetooth*, 654 F.3d at 947.  "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *Id.*  Such signs include

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotation marks and citations omitted).

The Court previously analyzed these factors when considering the Settlement. Prelim. Approval Order at 14-20. Nothing before the Court compels it to re-evaluate that analysis. Accordingly, the Court incorporates its analysis as set forth in its Preliminary Approval Order and finds no indication of collusion.

**F.      Summary**

In light of the foregoing analysis, the Court finds the Settlement is fair, reasonable, adequate, and free of collusion. The Court therefore GRANTS Plaintiffs' Motion for Final Approval.

## MOTION FOR ATTORNEYS' FEES AND ENHANCEMENT AWARD

**A.      Attorneys' Fees**

Courts may award attorneys' fees and costs in a certified class action as authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941.

"In this circuit, there are two primary methods to calculate attorneys fees: the lodestar method and the percentage-of-recovery method." *In re Online DVD*, 779 F.3d at 949. "[C]ourts have discretion to choose which calculation method they use[.]" *In re Bluetooth*, 654 F.3d at 942. But the Ninth Circuit "encourage[s] courts to guard against an unreasonable result by cross-checking their calculations against a second method." *Id.* at 944-45 (citations omitted).

When applying either method, courts evaluate the reasonableness of the award by balancing the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

1    *Resurrection Bay Conservation All. v. City of Seward, Alaska*, 640 F.3d 1087, 1095 & n.5 (9th

2    Cir. 2011) (quoting *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)). "Foremost

3    among these considerations, however, is the benefit obtained for the class." *In re Bluetooth*, 654

4    F.3d at 942.

5          2.    <u>Analysis</u>

6        The Settlement allocates $1,866,666.67 in attorneys' fees and costs. *Id.* § 3.6(e). Plaintiff

7    requests the full amount as compensation for fees and costs combined. Fees Mot. at 13.

8        Class Counsel spent a total of 1,043.7 hours litigating this action:

| Attorney | Hours | Rate | Lodestar |
|---|---|---|---|
| Shaun Setareh | 385.6 | $725 | $279560.00 |
| H. Scott Leviant | 493.4 | $675 | $333,045.00 |
| Thomas Segal | 27.1 | $650 | $17,615.00 |
| Tuvia Korobkin | 30.9 | $550 | $16,995.00 |
| Farrah Grant | 43.8 | $350 | $15,330.00 |
| Alice Kim | 38.4 | $400 | $15,360.00 |
| Stacey Shim | 24.5 | $250 | $6,125.00 |
| **TOTALS** | 1043.7 | -- | $684,070.00 |

18    Fees Mot. at 14; Leviant Decl. ¶ 32; Suppl. Leviant Decl. ¶¶ 6-10. Plaintiff also requests fees for

19    an additional 19.8 hours of work performed by Mr. Leviant, for a total of $13,365.[5] Suppl.

20    Leviant Decl. ¶ 11, Dkt. No. 104. These hours represent work performed between the time

21    Plaintiff filed the Motions for Final Approval and Attorneys' Fees and the hearing on these

22    Motions. *Id.* Thus, Plaintiff requests a total of $697,435 in attorneys' fees.

23        The Court first considers the request for attorneys' fees under a lodestar analysis, then

24    confirms the result by applying a percentage-of-recovery analysis.

---

27    [5] Plaintiff initially estimated Mr. Leviant would spend 25 hours on this litigation between the
filing of the Motions and the May 31, 2018 hearing. Fees Mot. at 14; Leviant Decl. ¶ 32. Mr.

28    Leviant subsequently updated that estimate. Suppl. Leviant Decl. ¶ 11.

United States District Court
Northern District of California

a.   *Lodestar*

"Use of the 'lodestar method' to calculate attorney's fees under a federal fee-shifting statute is proper." *Tahara v. Matson Terminals, Inc.*, 511 F.3d 950, 955 (9th Cir. 2007) (citing *Staton*, 327 F.3d at 965). "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. This method therefore requires a two-step process: "First, a court calculates the lodestar figure by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate." *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016). "Second, the court determines whether to modify the lodestar figure, upward or downward, based on factors not subsumed in the lodestar figure." *Id.* "There is a strong presumption that the lodestar is a reasonable fee." *Stetson v. Grissom*, 821 F.3d 1157, 1165 (9th Cir. 2016).

i.   Hourly Rate and Hours Expended

"A reasonable hourly rate is ordinarily the 'prevailing market rate in the relevant community.'" *Kelly*, 822 F.3d at 1099 (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)) (brackets omitted). "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008); *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013). "Rates outside the forum may be used if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Camacho*, 523 F.3d at 979 (internal quotation marks and edits omitted). The relevant community here is the Northern District of California.[6]

---

[6] Plaintiff initially analyzed counsel's hourly rates in relation to rates charged by attorneys in Los Angeles. Fees Mot. at 13-14; Leviant Decl. ¶¶ 24, 30(d). Plaintiff's only bases for using the Los Angeles region as the relevant legal community are that "the matter spans the state, and several facilities at issue are in the greater Los Angeles are[a.]" Suppl. Leviant Decl. ¶ 4. Plaintiff offers no authority to support this position. Indeed, "Plaintiff does not have a dispositive basis for contending that San Francisco should not be analyzed in the same manner as Plaintiff analyzed hourly rates for Los Angeles[.]" *Id.* Plaintiff also offers no reason to believe local counsel was unavailable such that Los Angeles rates should apply here.

16

Mr. Leviant describes counsel's experience and qualifications. Leviant Decl. ¶¶ 22-23, 25, 28; Suppl. Leviant Decl. ¶¶ 6-10. Plaintiff's requested hourly rates fall between $250 for an attorney with three years of experience and $725 for a managing attorney with nineteen years of experience. This range of rates is consistent with the overall range of market rates in the Northern District for attorneys with commensurate experience. *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (district court did not abuse its discretion in awarding 2008 hourly rates for Bay Area attorneys of up to $875 for a partner, $700 for an attorney with 23 years of experience); *Slezak v. City of Palo Alto*, 2017 WL 2688224, at *6 (N.D. Cal. June 22, 2017) (awarding hourly rates of $600 to attorney with 18 years of experience in wage and hour litigation, $400 to attorney with 10 years of experience, and $265 to attorney with 9 years of experience); *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (finding reasonable rates for Bay Area attorneys of between $475-$975 for partners, and $300-$490 for associates).

Beyond establishing a reasonable hourly rate, a party seeking attorneys' fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Counsel must exercise sound "billing judgment" as to the number of hours worked, eliminating excessive, redundant, or unnecessary hours, and provide billing records supporting the time claimed. *Id.* at 433-34. Class Counsel "is not required to record in great detail how each minute of his time was expended," but should "identify the general subject matter of his [or her] time expenditures." *Id.* at 437 n.12; *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (quoting *Hensley*, 461 U.S. at 437 n.12).

Counsel dedicated a total of 1,063.5 hours to this litigation. Leviant Decl. ¶¶ 22-23, 25, 28; Suppl. Leviant Decl. ¶¶ 6-10. Counsel spent these hours drafting and reviewing pleadings, engaging in motion practice, responding to discovery requests, reviewing discovery responses, communicating with Plaintiff, preparing for and attending mediations, communicating with defense counsel, and analyzing damages models. *Id.* Based on Mr. Leviant's Declarations, the Court finds counsel expended a reasonable number of hours litigating this case. *See Fox v. Vice*,

563 U.S. 826, 838 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.").

ii.    Lodestar Calculation

Applying the reasonable hourly rates to the number of hour reasonably billed, Class Counsel's lodestar is $684,764.80. "After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 265 (N.D. Cal. 2015).

"[A]ttorneys' fees in common fund cases are not paid by the losing defendant, but by members of the plaintiff class, who shoulder the burden of paying their own counsel out of the common fund." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994). But "[t]here is nothing unfair about contingency enhancements in common fund cases because of the equitable notion that those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *Id.* (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 477 (1980)). On the contrary, "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002). "[A]ttorneys whose compensation depends on their winning the case must make up in compensation in the cases they win for the lack of compensation in the cases they lose." *Id.* (internal quotation marks and brackets omitted); *see Hopkins v. Stryker Sales Corp.*, 2013 WL 496358, at *4 (N.D. Cal. Feb. 6, 2013) (multipliers "account for the risk Class Counsel assumes when they take on contingent-fee cases").

Counsel seek a multiplier of 2.66 to get to the requested $1,866,666.67 in fees. Mot. at 13-14; Leviant Decl. ¶ 32. "'Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases.'" *Destefano v. Zynga, Inc.*, 2016 WL 537946, at *21 (N.D. Cal. Feb. 11, 2016) (quoting *Hopkins v. Stryker Sales Corp.*, 2013 WL 496358, at *4 (N.D. Cal. Feb. 6, 2013)); *see Vizcaino*, 290 F.3d at 1051 n.6 (citing survey finding most multipliers range from 1.0 to 4.0). Several courts considering attorneys' fees in employment cases have awarded multipliers of less

than two. *See, e.g.*, *Nelson v. Avon Prod., Inc.*, 2017 WL 733145, at \*6 (N.D. Cal. Feb. 24, 2017) (multiplier of 1.3 resulted in reasonable attorneys' fee award); *Bickley v. Schneider Nat'l Carriers, Inc.*, 2016 WL 6910261, at \*4 (N.D. Cal. Oct. 13, 2016) (multiplier of 1.81 is "fair"); *Bellinghausen*, 306 F.R.D. at 265 (multiplier of 1.49 appropriate); *de Mira v. Heartland Empl't Serv., LLC*, 2014 WL 1026282, at \*4 (N.D. Cal. Mar. 13, 2014) (finding multiplier of 1.36 resulted in an award "consistent with case law"). That said, a multiplier of 2.66, albeit on the high side, is not automatically unreasonable. *See Hopkins v. Stryker Sales Corp.*, 2013 WL 496358, at \*5-6 (N.D. Cal. Feb. 6, 2013) (rejecting requested multiplier of 3.2 and finding award representing multiplier of 2.76 appropriate).

Plaintiff concedes this case did not present complex or novel legal issues. Fees Mot. at 11; Leviant Decl. ¶ 37 ("This case, in a global sense, was not of the highest nor lowest complexity. . . . ."). However, taking on this case meant counsel was precluded from other employment, and counsel accepted this case on a contingency basis. Fees Mot. at 11; Leviant Decl. ¶¶ 35-36. As discussed above, there were significant risks to this litigation that made an outcome favorable to Plaintiff uncertain.

Moreover, the fact that the requested $1,866,666.67 includes both attorneys' fees and costs suggests that the multiplier on the fees is actually lower than 2.66. And, as discussed below, the percentage-of-recovery analysis confirms the requested attorneys' fees are not unreasonable. For these reasons, the Court finds a multiplier of 2.66 reasonable under these circumstances.

b. *Percentage-of-Recovery*

"Under the percentage-of-recovery method, the attorneys' fees equal some percentage of the common settlement fund[.]" *In re Online DVD*, 779 F.3d at 949. In the Ninth Circuit, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942. "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

1    The requested $1,866,666.67 in attorneys' fees is approximately one-third of the

2    Settlement Sum. While higher than the 25% benchmark, such a percentage is not uncommon in

3    wage and hour class action settlements such as this. *See Salamanca v. Sprint/United Mgmt. Co.*,

4    2018 WL 1989568, at *1 (N.D. Cal. Mar. 9, 2018) ("[C]ourts in this circuit have generally

5    recognized that the typical attorneys' fee award in common fund cases will fall between 20% to

6    33% of the total settlement value."); *Ruch v. AM Retail Grp., Inc.*, 2016 WL 1161453, at *12

7    (N.D. Cal. Mar. 24, 2016) (finding as reasonable fee award totaling no more than 30% of the

8    settlement amount in wage and hour class action settlement); *Wren v. RGIS Inventory Specialists*,

9    2011 WL 1230826, at *28 (N.D. Cal. Apr. 1, 2011), *supplemented*, 2011 WL 1838562 (N.D. Cal.

10   May 13, 2011) (approving attorneys' fee of 42% of common fund in wage and hour class action);

11   *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959, at *11 (C.D. Cal. Aug. 4, 2015)

12   ("[A]n award of 30% is consistent with awards granted in similar complex [wage and hour]

13   litigation."); *Stevenson v. Dollar Tree Stores, Inc.*, 2011 WL 4928753, at *5 (E.D. Cal. Oct. 17,

14   2011) ("[I]n California, where  wage and hour class actions have settled prior to trial for millions

15   of dollars, it is not uncommon for an attorneys' fee award to be in the realm of 25% to 30% of the

16   settlement and, thus, in excess of $1 million." (internal quotation marks omitted)).  Accordingly,

17   the Court finds the percentage-of-recovery analysis confirms the reasonableness of Plaintiff's

18   requested attorneys' fees.

19       3.    Summary

20   Based on the foregoing analysis, the Court approves the request for $1,866,666.67 in

21   attorneys' fees.

22   **B.    Administration Costs**

23   The Settlement allocates up to $25,000 in administration costs. *Id.* § 3.6(d).  "KCC agrees

24   to cap its administration costs at $24,750.00." Cooley Decl. ¶ 10.  Nothing in the record suggests

25   this is unreasonable.

26   **C.    Service Award**

27   Service or incentive "awards are discretionary . . . , and are intended to compensate class

28   representatives for work done on behalf of the class, to make up for financial or reputational risk

20

undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. "[D]istrict courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013). "Many courts in the Ninth Circuit have . . . held that a $5,000 incentive award is 'presumptively reasonable.'" *Gaudin v. Saxon Mortg. Servs., Inc.*, 2015 WL 7454183, at *10 (N.D. Cal. Nov. 23, 2015) (collecting cases).

"To determine the reasonableness of a requested incentive payment, courts consider the proportionality between the incentive payment and the range of class members' settlement awards." *Willner*, 2015 WL 3863625, at *9. Where there is a "very large differential in the amount of damage awards between the named and unnamed class members[,]" such differential record must be supported by the record. *Staton*, 327 F.3d at 978.

"Incentive awards typically range from $2,000 to $10,000." *Bellinghausen*, 306 F.R.D. at 267 (collecting cases). "In the Ninth Circuit, a $5,000 incentive award is consistent with the amount courts typically award as incentive payments." *Villanueva v. Morpho Detection, Inc.*, 2016 WL 1070523, at *7 (N.D. Cal. Mar. 18, 2016) (collecting cases) (internal quotation marks omitted).

Plaintiff seeks a $10,000 enhancement award. Fees Mot. at 16. He declares he has "devoted a substantial amount of [] time, both before this lawsuit was filed and also during its litigation to ensure a fair result for the employee class." Leviant Decl., Ex. 3 (Fronda Decl.) ¶ 4; *see id.* ¶ 11 ("I believe I have provided dozens of hours of my time during the course of this litigation to ensure a good outcome for the best interests of the class."). This includes communicating and providing and reviewing information with counsel, assisting in providing written discovery, participating in mediation, and reviewing the Settlement. *Id.* ¶¶ 5-10.

The Court cannot find a $10,000 service award is appropriate in this case. First, the Court cannot find the extent of Plaintiff's participation in this litigation warrants an upward deviation from this district's presumptively reasonable $5,000 service award. Plaintiff's work was standard for a named plaintiff in a class action. *See See Roe v. Frito-Lay, Inc.*, 2017 WL 1315626, at *8

(N.D. Cal. Apr. 7, 2017) (noting "[p]laintiff's contributions, though significant, would be necessary in any class action" where plaintiff spent approximately 96 hours meeting with class counsel to discuss case strategy, assisting in drafting and reviewing court filings, and being available for settlement negotiation).  The Court previously noted that

> Plaintiff does not indicate whether he has suffered or risked harm to his employment prospects and does not otherwise provide justification for deviating from the presumptively reasonable $5,000 service award.  *See* Fronda Decl.; *see, e.g.*, *Nelson*, 2017 WL 733145, at *6-7 (finding $10,000 service award appropriate where plaintiff sat for an all-day deposition, searched for relevant documentation, reviewed documents and settlement papers, attended the mediation and subsequent negotiations, and aided counsel with negotiation efforts, and where plaintiff "suffered some risk to her professional reputation by participating in this action as lead plaintiff"); *Moore* [*v. PetSmart, Inc.*], 2015 WL 5439000, at *13 [(N.D. Cal. Aug. 4, 2015)] (awarding $10,000 service awards to named plaintiffs who actively participated in litigation and "incurred the additional risk of fearing retaliation by" the defendant).  Courts have awarded less than $10,000 in service awards to named plaintiffs who have performed more work on the litigation than Plaintiff's "dozens of hours."  *See, e.g.*, *Willner*, 2015 WL 3863625, at *9 (reducing service award from $11,000 to $7,500 where class members' recovery ranged from $605.02 to $4,105.33 and where plaintiff spent 54 hours prosecuting action over four years, including sitting for a day-long deposition, responding to written discovery requests, assisting with initial disclosures, completing declarations, assisting with preparation for mediation, and evaluating proposed settlement); *Lopez v. Bank of Am., N.A.*, 2015 WL 5064085, at *8-9 (N.D. Cal. Aug. 27, 2015), *appeal dismissed* (Feb. 17, 2016), *appeal dismissed* (Feb. 22, 2016) (decreasing incentive award from requested $10,000 to $5,000 where (1) two named plaintiffs spent 80 and 100 hours working on litigation, but did not testify, sit for deposition, or participate in any of the four mediations; (2) $10,000 was 48 times greater than average payout to class members; and (3) incentive award would be paid from settlement fund); *Burden v. SelectQuote Ins. Servs.*, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013) (finding $5,000, rather than requested $10,000, an appropriate service award where named plaintiff "was deposed twice, attended three settlement conferences, and spent a total of 80 hours on this case" and where $10,000 was "nearly three times the largest amount paid to any class member").

Prelim. Approval Order at 19-20.  Plaintiff offers no new facts to support a $10,000 service award; on the contrary, Plaintiff simply re-filed the declaration he offered with his motion for preliminary approval.  *Compare* Leviant Decl., Ex. 3 *with* Dkt. No. 86-3.

Second, the Court previously noted that the proposed $10,000 service award was significantly greater than Class Members' expected recovery of $1,270.  Prelim. Approval Order

at 19. A $10,000 service award is therefore approximately 12 times greater than Class Members' average recovery. Courts routinely reject awards that are disproportionate to class members' recovery. *See Roe*, 2017 WL 1315626, at *8 (reducing service award from $10,000 to $5,000 where "[a] $10,000 incentive award is substantially disproportionate to class members' anticipated recovery of $193.45"); *Smith v. Am. Greetings Corp.*, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) (in wage and hour class action, reducing $7,500 service award to $5,000 where requested award was 4.7 times greater than average class members' average recovery of $1,608.16); *Willner*, 2015 WL 3863625, at *9 (in wage and hour class action, rejecting requested $11,000 award in favor of $5,000 award where expected average settlement payment was $605.02); *Burden v. SelectQuote Ins. Servs.*, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013) (in class action against employer, rejecting proposed $10,000 award that nearly three times the largest amount paid to any class member and awarding $5,000). Thus, the disproportionate service award to class member recovery ratio counsels against such a high award.

While a $10,000 enhancement award did not preclude a preliminary approval finding, the Court ultimately cannot find that Plaintiff's efforts during this litigation warrant such an award. *See Wolph v. Acer Am. Corp.*, 2013 WL 5718440, at *6 (N.D. Cal. Oct. 21, 2013) (reducing service award from $5,000 to $2,000 where named plaintiffs, who spent 107.25 hours and 106.25 hours each on litigation, "d[id] not suggest that they undertook any great risk to either their finances or to their reputation in bringing this action").

Plaintiff's reliance on *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001), is misplaced.[7] *See* Fees Mot. at 16. In *Ingram*, a district court in Georgia approved a $300,000 incentive award after it was presented with "[a] great deal of evidence . . . regarding the unique

---

[7] Plaintiff's reliance *In re Southern Ohio Correction Facility*, 175 F.R.D. 270 (S.D. Ohio 1997), is also misplaced. Fees Mot. at 16. The district court "decline[d] to award the full amount requested by Class Counsel—$25,000 for each named Plaintiff" and instead left it to the settlement master to determine the appropriate amount. *In re S. Ohio Corr. Facility*, 175 F.R.D. at 277. "[T]he district court approved a recommendation by the claims administrator that the two class representatives be paid $7,500 apiece." *In re S. Ohio Corr. Facility*, 24 F. App'x 520, 523 (6th Cir. 2001). However, the Sixth Circuit ultimately reversed the district court's approval of these reduced awards, as the settlement did not authorize incentive awards. *Id.* at 527-30.

1   and extraordinary contribution these four individuals made to the investigation, prosecution, and

2   settlement of this case." 200 F.R.D. at 694. This evidence included "testimony of Class Counsel

3   and the mediator, who uniformly agreed that in no prior case within their experience had Class

4   Representatives been as involved with the litigation as in this case." *Id.* The *Ingram* court also

5   found the named plaintiffs "took risks, bore hardships, and made sacrifices that absent class

6   members did not." *Id.* Moreover, the settlement "ensure[d] a guaranteed recovery to every class

7   member averaging approximately $38,000." *Id.* at 688.

8        There is no evidence in this record that Plaintiff's contribution to this litigation comes

9   close to that of the *Ingram* plaintiffs. As noted above, there is no evidence that Plaintiff took any

10   risks in bringing this lawsuit. There is also no evidence that Plaintiff's contributions to this case

11   were extraordinary or went above and beyond that of a typical class representative. Moreover, the

12   $38,000 average payment to class members in *Ingram* is significantly greater than the monetary

13   benefit Class Members obtain under this Settlement. *See* Cooley Decl. ¶ 9 (estimated maximum

14   class member allocation is $16,203.28; estimated average allocation is $822.23).

15        Accordingly, the Court finds $5,000 is an appropriate enhancement award for Plaintiff.

16                                    **CONCLUSION**

17        The Court **GRANTS** the Motion for Final Approval and **GRANTS IN PART** the Motion

18   for Attorneys' Fees. The Court **ORDERS** the following:

19        1.      The Settlement is finally approved a fair, reasonable, and adequate.

20        2.      The Settlement Class is defined as "any and all individuals employed by the CBS

21   Defendants at CEVA Freight, LLC, CEVA Logistics U.S., Inc. and/or any other location of

22   CEVA, CEVA's parents or any CEVA-related entity operating in California during the Class

23   Period (April 17, 2011 through the date of preliminary approval of this Settlement by the Court)."

24        3.      Payment to all Settlement Class Members shall be issued pursuant to the terms of

25   the Agreement.

26        4.      Class Members who did not submit a timely and valid written request to be

27   excluded from the Settlement are bound by the terms of the Agreement.

28        5.      Settlement Class Members who did not timely object to the settlement set forth in

the Agreement are barred from prosecuting or pursuing any appeal of this Order.

6. Shaun Setareh and H. Scott Leviant of the Setareh Law Group are confirmed as Class Counsel.

7. Class Counsel are awarded $1,866,666.67 in attorneys' fees and costs.

8. Plaintiff Earl Fronda is confirmed as the class representative and shall receive a $5,000 enhancement award, to be paid in accordance with the terms of the Settlement.

9. KCC, LLC is confirmed as Settlement Administrator.

10. Settlement administration costs are awarded in the amount of $24,750.

11. This Order shall constitute a final judgment in this action.

12. This Settlement does not resolve the matter as to Defendant CEVA LOGISTICS, U.S., INC., though it does resolve claims by the Settlement Class against any joint employers of the CBS Defendants, including CEVA Freight, LLC and CEVA Logistics U.S., Inc., to the extent that any of the claims settled as to the CBS Defendants would apply to any CEVA defendant.

13. The Court shall retain jurisdiction over this matter for the purposes of implementing, enforcing and/or administering the Settlement or enforcing the terms of the Judgment.

14. No later than September 28, 2018, the parties shall file a joint status report indicating (1) the number of Class Members who have cashed their settlement checks, (2) the amount of uncashed funds, (3) any issues the parties believe should be addressed, and (4) a proposed course of action for remedying such issues, if any.

**IT IS SO ORDERED.**

Dated: June 1, 2018

_____
MARIA-ELENA JAMES
United States Magistrate Judge